v. Gant, 18-3226. May it please the court. Good morning, your honors. I am Adam Davis, here representing the appellant Gabriel Gant. This court should reverse the trial court's grant of summary judgment. There are several disputed issues of fact as to whether Progressive discharged its duty to defend and settle the underlying case in good faith and without negligence. Before I start into the argument on settlement, I want to go over one quick background point. Mr. Gant holds the claims of all four Burke defendants by contractual assignment. Therefore, in this federal litigation, Mr. Gant asserts that Progressive is liable for its bad faith and negligence in defending the Burkes in the underlying state court litigation. The first issue we have raised on appeal involves Progressive's failure to settle. This court should first hold that Progressive had the duty to make reasonable efforts to settle the case, and on these unique facts, that included the duty to look for any additional insurance that covered any aspect of the underlying damages. Are there any Kansas cases that support that position? There are no Kansas cases that go into that specific issue. However, the Kansas law is clear that every case in this context is determined circumstantially. For instance, the Bollinger case from the Kansas Supreme Court unpacks what the standard is, and in Bollinger they say that you look at all of the circumstances of the case in determining both good faith and negligence. So there's not a Kansas case in either way on this, because this particular fact pattern has not come up. Do you have any other cases other than the two old cases that you refer to from other jurisdictions where a defense or an insurance company has to go root out other policies that may be in existence? There are two that we did cite in our briefs, Your Honor, one from Montana and one from Oregon. And they're both quite old. They are old, yes. Do you have any other cases? Those are the two cases we found that specifically deal with rooting out other insurance. But there's a Kansas case that we feel like is very much on point in terms of negligence. And it's important to remember that both good faith and negligence are duties at issue here. But where do you find the duty to go find another company that might also have a policy? Is there any evidence in the record that the insurance company knew but didn't tell of this other policy? There's evidence that the insurance company knew that there were other policies. As to whether they knew that this specific policy provided coverage is unclear. But that's why the Hawkins case from the Kansas Supreme Court is so important. Because in that case, they were evaluating this under a negligence standard. It was a bad faith claim. It was brought as a garnishment, as a direct action. But what the plaintiff was arguing was that they were negligent in their investigation. And what the Kansas Supreme Court said is, we are going to look at this in terms of what the insurer knew or should have known with due diligence. About what? About the accident or about other policies? About the extent of the insurer's investigation. No, wait a minute. They say the investigation of what? In the context of settlement. Investigation of what? The facts of the case? Other insurance? Other drivers? Explain yourself. In that case, the issue was the investigation into whether to accept an offer of settlement from the other side. So the argument was that they rejected that offer. They, the insurance company, rejected that offer without doing an adequate investigation. The trial court agreed and then the Supreme Court affirmed that saying, we are going to look at this on a standard, a traditional negligence standard of what they knew or should have known with due diligence. And the facts here are... Let me ask you about the facts. Yes. Because my understanding of the record, which is not totally clear, so maybe you can help me on this, is that the insurance company sent a letter to the insured asking about other policies, was told there were none, that the attorney hired by the insurance company, hired by Progressive, then met with the insured and the insured's attorney and was told there's no other coverage. What more could Progressive have done? Does it have a duty to say that your personal attorney who's looked at this is wrong about whether there are other policies? So tell me what the facts are. See if I've got the facts right and then explain what Progressive was supposed to do. There are certain background facts that are very important here because, first of all, the Progressive's policy limit was $250,000. And Progressive voluntarily took on the defense of a business, Burke Oil, that had separate insurance, not Progressive insurance. And the claim by Progressive's own estimation was worth about $5 million. So there was severe excess exposure. So under these circumstances... So far that's irrelevant to my question. Right, right. Please, please tell me. Yeah, okay. As to what Progressive should have done, Progressive should have... Was done. I'd like to know what the facts are. Oh, I'm sorry, Your Honor. Am I correct that Progressive asked the insured if there are other policies that are involved that could cover the accident and was told no? Is that correct? They asked if there was excess insurance. Now the BitCo policy was not actually excess  insurance. Okay, go ahead. I'm sorry. And they did ask McMaster to look at policies. Who did? Progressive did? Progressive did. So Progressive asked McMaster. McMaster met with Burke's and their personal attorney. Is that right? I believe that's what he testified to, yes. And the personal attorney said there's no other coverage for this accident. Is that correct? I don't know if the personal attorney specifically said that, but that's what McMaster told Progressive after they had... We don't know what the conversation was between McMaster and the personal attorney and perhaps Mr. Burke. There's no evidence in the record about that conversation. I'm not aware of whether that specific evidence is in the record. But I think the key... Yeah, so what are you supposed to do? They should have... You're supposed to say, well, we think you, the insured, are lying to us and your attorney is incompetent. So we want all the records. What are you supposed to do? There are several things that they should have done, Your Honor, and our expert does go through them in his report. Most notably, Gant's counsel was saying, we are not going to settle for the policy limits because we believe there is other insurance. Please tell us who covers the business. And Progressive never asked that question. They never found out who was covering the business. Finally, and he's entitled to ask interrogatories about this, Gant finally did it. At that point, the Burks produced the policy and that's when it was discovered that there might be this other coverage. Isn't that correct? There were, once we got into suit, there were interrogatories that led to discovery, although after months of a protracted fight. But the period that is key here is that there's almost two years pre-suit where the negotiations are happening and that's where the opportunity to protect the Burks was. So that's another question I'm curious about. What happened, what did the Burks learn during this period that made them insist on seeking more, a higher liability figure, that they would demand more money? You're saying, well, they might have settled earlier for 1.25 million even though they demanded 5 million throughout. So what did they learn that made this so much more valuable in the interim, between the time you think Progressive should have discovered the other coverage and when the other coverage was discovered? Well, pre-suit, Your Honor, there is evidence that it could have settled for 1.25 million. What is that evidence? That once BITCO, which covered Burke Oil, eventually was put on notice years later, they immediately offered their $1 million policy limits because there was clear coverage under their auto policy. So the defendants would have offered 1.25. What's the evidence that the plaintiffs would have taken 1.25 million? Given the fact that they rejected anything under 5 million later on, what made the case so much more valuable to them in the year, say, before the BITCO policy coverage was discovered? There are two parts to that, Your Honor. As far as the evidence pre-suit, Mr. Gant, when he was convinced that 1.25 million was all of the insurance that was available, he more likely than not would have accepted that. There is also evidence that he almost took the 250 that was on the table because he thought that might be all of the insurance, but he didn't because he felt like there was probably more out there. So that's pre-suit. Now, why is it different years later? And did he make any request of the Berks to provide other insurance policies before the litigation and the discovery of the litigation? He was making the request directly to Progressive over and over again to please tell us who insures the business. What's the record evidence? You say that in your brief. There was a letter from Mr. Likens to Progressive on June 21, 2011, that asked about other insurance. But you say over and over, do you have any other examples from the record? It is in, and I'm sorry, I couldn't give you the exact page, but it is in Mr. Likens' deposition testimony that he continued to ask during phone calls about that business insurance, and he was never given an answer. And Hansel's response in his deposition was, well, he didn't think that Justin Burke was in the course and scope of employment. But to us, that is part of the negligence because, A, the record shows that Justin Burke was on his way to the oils fields. That's what he told the police after the accident. And, B, even if he wasn't in the course and scope of employment, there's still the question of whether there's an auto policy that covers it regardless of whether he's in the business. I'm still interested in your clarifying your position on the scope of the duty. Even those old cases from Montana and Oregon talk about simply a duty to inquire. Didn't Mr. Hansel inquire right off the bat whether there was other applicable insurance? He inquired as to excess coverage. And what we are saying is that there is a duty of reasonable diligence and that there is also a duty of... or just other insurance. Because the business could have all kinds of insurance. It may not even cover automobiles. So if the duty is to ask about any and all conceivable insurance, that's one thing. It's another thing to ask about insurance that would be applicable to this accident. So we don't have a Kansas case. We have these old Montana and Oregon cases. And there's still this question about whether there's a duty in the first place. And even if there is, what's the scope of it? And it doesn't seem to me you've been very precise about that. The duty would be to ask about insurance that would be applicable. And what we know here... Didn't Mr. Hansel do that? I mean, he sent the letters to Justin Burke. He sent the letters to his father. And then he talked to Laura Burke on the phone. That's all in the record. And there was no response about other applicable insurance. Well, Your Honor, that gets into the question of whether that duty was breached. You know, we say there is a duty to search for applicable insurance. And then they can certainly argue to the jury that we sent this letter and we retained McMaster to do this and that was sufficient. And our argument would be, well, Gann is asking you who is insuring the business and Progressive never answers that question. Progressive never puts BitCo on notice. It's simply logical that if they're taking on the defense of Burke Oil Company that they would put that carrier on notice because it benefits everybody if there's additional insurance. So that's the breach question. Well, additional insurance or additional applicable insurance. Burke could have all kinds of different insurance policies. It would only be if there's one that actually might cover the accident. And our argument would be that they have to be diligent in determining whether the additional insurance is applicable. Not that they have to search the world for it, but that they at least need to ask the business carrier when they have assumed the defense of that We'll reserve the remaining 45 seconds for rebuttal if there are no further questions. All right. Thank you. Good morning. May it please the court. Joseph Kassane on behalf of Progressive Northwestern. The court is entirely correct. Would you first clarify the record regarding what efforts Progressive and its attorney made to determine whether there was other insurance? Absolutely. I'd be happy to. Progressive, Your Honor, went to extensive efforts here. Within 10 days of the accident, it wrote letters not to one Burke, but to both the father and son. That letter inquired, do you have any coverage? There's been a representative. Did he say excess coverage? He did not say excess coverage. What he said specifically is, do you have coverage which would be excess of our policy? The Progressive policy was primary. You can have other primary policies as you do a ladder of coverage that would be excess even though they're both primaries. He did not say, do you have other excess coverage? He said, do you have coverage in excess of our policy? What Progressive did was, within 10 days, write two letters. Did they have a duty to do that? Did Progressive have a duty to do that? Absolutely not. There is not a single case in the history of American jurisprudence putting that duty on an insurance company. And Judge Matheson, it wouldn't make sense because the carrier is at the mercy of the insured. The carrier only knows what it's told. And here it asked multiple times, orally and in writing, through lawyers, through multiple lawyers. And to answer your question, Judge Kelly, Progressive learned about this policy in February of 2015, not before that. And there is no duty because this information rests with the insured. The insured paid $30,000 a year for this policy. And what's important for the court to note is that at the time this is all going on, in 2011, there's no claim against Burke Oil. There's no claim against what? I'm sorry. Against Burke Oil. The only claim is against Justin Burke. There's no claim against mom and dad. B&B Cooperative Ventures, who's the named insured under the BITCO policy, is not brought into this case and mentioned until September of 2014. So this goes beyond just a duty. They're asking them to disclose a policy of insurance issued by a different insured to a different, I'm sorry, by a different insurance carrier. What happened in September 2014? In September of 2014, Burke Oil, Your Honor, had been a party to this litigation. There was some consternation as to the relationship of those... Is that when they filed suit, you mean? No, they filed suit in May of 2013, but B&B Cooperative Ventures became involved in September of 2014. And just to close the loop on that, Judge, Burke Oil had been involved. The lower court judge, Judge Goddard, got frustrated as to the interrelationship of these various companies and essentially said they're all Burke Oil. But what's... Would you continue with what the record shows about conduct? Yes, so this is extensive. Because there's also a meeting between the progressive's attorney, or some communication between the progressive's attorney and the personal attorney of the Burkes, is that correct? This is... What progressive did is extensive and with no duty, it is as follows. All established and... You pull the microphone over a little closer. Thank you. Sorry about that. All undisputed in the record. Here's what progressive does. Within 10 days, as I say, they send out this letter. They call Mrs. Burke within that same Junetown 2011 timeframe. She says, Hansel says, I called her and she said there was no other insurance. The case then goes to McMaster. Progressive hires him within three weeks. And ultimately, progressive meets with James Campbell. That's the Burke's personal lawyer. You say progressive meets, you mean McMaster? I said progressive. McMaster meets with James Campbell. And they go over, Your Honor, not just the BitGo policy. They go over workers' comp policies, homeowners' policies, CGL policies. And McMaster, on May 13th, sends a letter to progressive that says, I have met with the insured's personal counsel and with the insured's. And we have discussed other coverage. We have looked at it and determined that no other coverage applies. He sends that letter, McMaster, to the adjuster at progressive Hansel. Campbell's copied on that letter. The Burke's are copied on that letter. And the letter affirmatively says, this policy does not apply. But it goes beyond that. At that same time, in April now of 2013, John Ambrosio, who's a lawyer representing Justin Burke in the criminal case, arising from the accident, writes the Burke's a letter. And here's what the letter says. It says, put all of your other carriers on notice, including your company's insurance carriers. And despite that, they never do that. They don't disclose this coverage, even in discovery. But here's the linchpin of all of it. It's all in the record. It is all in the record. Can I just ask about one other document in the record? And that's the letter from Mr. Likens to Tameka Rankin at Progressive on June 21, 2011. And it says, what insurance company insured the businesses that were owned by Edward and Linda Burke and any business that was owned by Justin Burke? And they're claiming that that was asked early on, and there was never a response to that from Progressive. It's not true, Your Honor, because we did even more than that. We sent them a letter saying, tell us about all insurance. We didn't limit it to business insurance. So that letter, that Likens letter, came within days of Hansel having already made that request. Well, no, the request from Mr. Hansel talked about a policy that may provide coverage in excess of this policy, but the request was broader than that. The request was, what insurance company insured the businesses? That goes, that's a broader question than the question that Mr. Hansel asked. I think actually Hansel, with all due respect, Your Honor, Hansel's question may have been broader, but here's what happens. Mr. Likens, I'm saying Mr. Likens' question is broader than Mr. Hansel's. And even if I accept that, Your Honor, that's all answered by the fact all of this was looked at. All of this was analyzed. This issue wasn't missed. Two lawyers, including the Burke's personal lawyer, who had been involved in this case from the very beginning, looked at that and told Progressive the coverage doesn't exist. And Judge Robinson said, even if you had said that was made known to you. Except Bitco ended up saying it does. Pardon me? Bitco ended up saying it does exist. Well, that's the other fatal flaw in this, Your Honor, is because the lawyer made a mistake. It's a legal malpractice case. So we have this assignment within a Glenn versus Fleming agreement that tries to transfer to the Gantt, essentially the Burke's malpractice case, from misreading the policy. And that's what Judge Robinson ultimately said. There's so many legal dead ends in this case that even if you get past what Progressive did, and what they did was exemplary and over the top, and more than any insurance carrier does without a duty. But even if you get past that, their own lawyers said the policy doesn't apply, and there's zero evidence anything would have happened if you had known about it. Here's why. The lawyers didn't demand $5 million. Likens thought it was worth $10 million. Kiefer thought it was worth $20 million. They negotiated at mediation between a range of $6 to $10 million. They asked the court at trial for $15.8 million, and the lower court said, where's the reasonable opportunity to settle? Progressive tendered their limits within nine weeks. They tendered those limits over and over and over again. What about Mr. Gantt? Mr. Gantt's testimony in his deposition that he wouldn't have settled. Well, let's go over that because that... I'm sorry, that he would have settled for less. That's not what he said. And I asked that question to Mr. Gantt, and I frankly almost fell out of my chair when he answered it. Here's what the question was. Was there ever a time during the litigation when $1.25 million would settle this case? His answer was, I can't really say one way or another. The question you've heard about was on redirect. After I was done cross-examining this witness, they asked, well, would you probably have not settled? And he said, I probably would have. The first answer he gave to a direct question as to whether there was... For the jury to decide, is it not? If there's a conflict, if he says something after being rehabilitated, we'll call it, by his attorney, we still have to consider that as something the jury might end up believing, don't we? That much is true, Your Honour, except here's where the whole thing collapses of its own weight. This was never about insurance. This was never about the BitGo insurance. Even in the initial stages of this litigation, it wasn't about the BitGo insurance. It was about this lawyer, McMaster, had a scorched earth defence, and he hurt the Berks. The only problem is there's no evidence that it caused any damage. It did not cause any damage whatsoever. So here's where it collapses of its own weight. When Gant learns about the BitGo policy in February of 2014, when they learn about that policy, they do absolutely nothing. They don't put BitGo on notice. They don't try and make a claim. They do nothing. And now they're trying to say, well, we didn't have the policy. There were answers to interrogatory in February of 2014 that said this is the BitGo policy, this is the BitGo claim number, here's the BitGo deck page. And now we're being told that this policy is the end-all and be-all of this case that we should have known about earlier, but when we did know about it, we did nothing with that information. You're talking about the Gants did nothing? They did nothing with... The Gants lawyers did nothing with that information. Ultimately, when Progressive is finally advised of this policy, a year later in February of 2014, lawyers hired by Progressive at that point put BitGo on notice. That's how BitGo became aware of this. So not only does Progressive ask all of these questions, and I understand, Your Honour, about the business insurance letter and the fact that the business insurance letter, that question may not have been specifically asked, but Hansel said, at the time the letter came in, I had already hired counsel for the insured. Something Progressive was not required to do, right? So Progressive only has to have a lawyer if you're sued. Hansel said they already had a lawyer and the lawyer was going to look into it. Let me get to another issue. Not whether McMaster committed malpractice, but whether Progressive was negligent in hiring McMaster. What is the evidence regarding Progressive's knowledge of McMaster's incompetence? Or however you want to put it. So that's a good question, Judge, and one I'm prepared to defend. Progressive... Progressive hires McMaster. Here's what the lower court found. First of all, Kansas law requires that you hire a lawyer competent to handle the factual allegations of the complaint. The court said that this lawyer represented most of the major carriers in Kansas and listed them in the order. Said that he had 30 years of experience, that he had tried more cases than virtually any lawyer in his area of Kansas, that he had handled thousands of cases, is what McMaster said. The lower court said he had handled hundreds of serious, wrongful death and personal injury cases. This is one of the most qualified lawyers in Kansas. And what they're trying to say, well, he had this settlement incompetency. Settlement incompetency. First of all, that's an extension of Kansas law. Kansas law says hire somebody who's competent to handle the case. And in the Hoydale case... Oh, but the insured, once a settlement that relieves the insured of any individual responsibility, excess of the insurance coverage, that should be something that the attorney for the insured should be cognizant of and try to represent the insureds on, isn't it? Absolutely true, Judge. And so what is the evidence about that? Here's the evidence. The evidence is that the plaintiff was able to come up with an affidavit and letters from three lawyers that they made part of the record. Those affidavits and three letters generally state, hey, we found this guy difficult to deal with. From a settlement standpoint, we found him difficult to deal with. But when you unpack those allegations, here's what they say. The man that... Is anyone out looking for lawyers? The one lawyer files an affidavit, it seems like as a favor because the first thing the affidavit says is, I have limited experience with this lawyer. The next letter from a lawyer is one that's delivered to Progressive two years after McMaster has been hired. So then we're left with two letters from lawyers in the same law firm that say over a 30-year career in an adversarial business, two lawyers in the same law firm had difficulty with this lawyer. But here's where that inquiry ends. Judge Robinson said, you're talking about settlement incompetency. That's not what you're saying McMaster did. You're saying he misread the BitGo policy. You're saying Campbell, the personal lawyer, misread the BitGo policy. That's a legal malpractice claim. So the judge said, even though I think you're expanding competency under Kansas law, the competency you're pointing to, this alleged settlement incompetency, which he found they didn't prove in the first instance, is not why the case didn't settle. The case settled because of a failure to read the policy properly, which is a legal malpractice claim. Now, your time's up. I want to ask one question. Maybe my colleagues have other questions. In the cases that the other attorneys complained about McMaster, those cases ultimately all settled within the policy limits. Is that correct? It's actually an excellent point, Your Honor. All of those cases they complained about, there was never a nickel of excess exposure to any progressive insured. And all of those cases settled within the policy limits. Thank you. Thank you for the time. We would ask that the court affirm the well-reasoned and well-written summary judgment by the district court. Thank you. Make it a minute. Thank you, Your Honor. Yeah. Do give them a little more time, because we went over. May it please the court. This case is absolutely about the BitCo policy, because that's the one thing that could have caused a pre-suit settlement. To answer Judge Matheson's question on page 2395 of the record, Hansel admits that he never asked anyone who insures the business. On the point that opposing counsel made about February 2014, it is absolutely not true that we got the whole BitCo policy at that point. We only got the declaration pages, which set off a months-long fight about whether we could get the entire policy. Regardless, that is a fact dispute. If they want to try to claim that our firm is somehow contributorily negligent, they can make that case to.  But have you really abandoned any type of civility? I would disagree with that assessment, Your Honor. I think the judge would. Take it up with the judge, but that's what she said. I'm sorry. Are you talking about the state court judge or the federal court judge below in this case? Federal court judge. Oh, OK. Yeah. OK. That's a fair characterization. The state court judge is what I was referring to, who was specifically annoyed with McMaster and his dishonest statements to the court. Before you sit down, I'm interested in hearing what you have to say about one thing we haven't talked about. But it's your argument about the joint representation of the Berks and the conflict issue. Yes, Your Honor. Why didn't the conflict waiver take care of that? A couple of points, Your Honor. And the waiver itself is not in the record, but it's quoted extensively by our expert, Brian Wright. And the waiver itself does not actually describe what the conflict might be. It just says that they are agreeing to all be jointly represented. And what our expert says is, if you are going to get a knowing waiver from the clients, you have to explain why Justin Berk could be advertised. Did your expert interview the Berks? I don't believe he interviewed the Berks. So how does he know what transpired between Mr. McMaster and the Berks in securing the conflict waiver? Well, he has seen the waiver itself. No, but he's seen the waiver, but he's saying, how could it be a knowing waiver? Well, how could he make an assessment of that if he doesn't know what the conversation was? It's true that he doesn't know what the conversation was, but the waiver on its face does not show that there was, in any way, a knowing waiver. And the other key point there is that Berk Oil isn't even mentioned. And I know they say, well, B&B doesn't come in until 2014. That's just another name for the same company. Berk Oil was involved from the beginning. Progressive assumed their defense. And the waiver talks about the three individuals. And to us, the most important point is the conflict between Justin Berk and Berk Oil. Because if Berk Oil had had its own counsel from the beginning, then Berk Oil's counsel would have put BitCo on notice, and there never would have been a lawsuit, because it would have settled pre-suit for $1.25 million. And thank you, Your Honors.